## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**FERNANDO LUGO-CRESPO**,

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.

Civil No. 16-1242 (BJM)

### OPINION AND ORDER

Fernando Lugo-Crespo ("Lugo") seeks review of the Commissioner's finding that he is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Lugo contends the Commissioner's decision should be reversed for lack of substantial evidence and failure "to deploy correct legal standards" because the hypotheticals the administrative law judge ("ALJ") provided to the vocational expert (the "VE") "did not convey all of the plaintiff's limitations." Docket Nos. 1, 19. The Commissioner opposed. Docket No. 11. This case is before me on consent of the parties. Docket No. 5. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

### STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review "is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence." *Manso-Pizarro* v. *Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, but not when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen* v. *Chater*, 172 F.3d 31, 35 (1st Cir. 1999). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Ass'n Gregoria Auffant, Inc.* v. *Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodriguez Pagan* v. *Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner must employ a five-step sequential analysis and consider all the record evidence. 20 C.F.R. §§ 404.1520, 404.1520(a)(3); *Bowen* v. *Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote* v. *Sec'y of Health & Human Servs.*, 690 F.2d 5, 6–7 (1st Cir. 1982). Under this sequential analysis, the Commissioner first determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). Second, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. *Id.* § 404.1520(c). If not, the disability claim is denied. Third, the Commissioner decides whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 404, subpt. P App'x 1. If the claimant's impairment meets or equals

one of the listed impairments, she is conclusively presumed to be disabled. If not, the evaluation proceeds to Step Four.

At Step Four, the ALJ assesses the claimant's residual functional capacity ("RFC"), which is the individual's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments, and then determines whether those impairments prevent the claimant from doing the work she previously performed. *Id.* §§ 404.1520(e), 404.1545(a)(1). If the claimant can perform her previous work, she is not disabled. *Id.* § 404.1520(e). If she cannot, the fifth and final step asks whether the claimant can perform other work available in the national economy in light of her RFC, age, education, and work experience. If she cannot, then she is entitled to disability benefits. *Id.* § 404.1520(f). The claimant has the burden of proof at Steps One through Four. *Santiago* v. *Sec'y of Health & Human Servs.*, 944 F.2d 1, 5 (1st Cir. 1991). If the claimant has met that burden, the Commissioner has the burden at Step Five. *Ortiz* v. *Sec'y of Health & Human Servs.*, 890 F.2d 520, 524 (1st Cir. 1989).

## BACKGROUND

On October 13, 2011, Lugo applied for disability insurance benefits ("DIB"), claiming that on June 20 of that year he fell on the stairs at his workplace and, as a result, suffers from depression, pinched nerves in his left leg, herniated discs, and pain in his lower back, neck, shoulders, and hands. Social Security Transcript ("Tr.") 132, 138, 338, 579. Lugo was 41 years old on the alleged onset date, had graduated high school, had worked at a shoe company as a shoe machine operator (DOT 753.584-010) for 13 years before becoming a house inspector (DOT 168.167-030) for 11 years, and does not speak English. Tr. 128, 130–31, 144–45, 335, 742. He met the insured status requirements of the Act through December 31, 2015. Tr. 110. Lugo's application for disability benefits was denied, both initially and on reconsideration. Tr. 504. He requested a hearing before an ALJ, and was heard by ALJ Emily Stratum in October 2013. Tr. 125, 507. The ALJ heard testimony from Lugo, who was represented by counsel, and from Marieva Puig, a VE. Tr. 125.

The ALJ issued her decision in March 2014. Tr. 102–24. The ALJ found that Lugo met the insured status requirements of the Act through December 31, 2015, had not engaged in substantial gainful activity since June 20, 2011, and suffered from the following severe impairments: "degenerative disc disease of the lumbo sacral area, cervical, dorsal and lumbosacral spasm and herniations, L5-S1 radiculopathy, carpal tunnel syndrome, and depression." Tr. 110. But the ALJ ultimately concluded that Lugo is "not subject to any impairment, or combination of impairments, that meets or medically equals the requirement of the Listings of Impairments of Appendix 1, Subpart P, Regulations." Tr. 110. Lugo appealed the ALJ's decision to the Appeals Council. Docket No. 1, Tr. 73. The Appeals Council denied Lugo's request for review in December 2015, rendering the ALJ's decision the final agency decision of the Commissioner. Tr. 1–4.

### Physical Impairment

The record contains evidence relating to Lugo's physical impairment. On June 20, 2011, the alleged onset date of Lugo's injury, Dr. Nilda Rivera Hernandez ("Dr. Hernandez") signed a report at the State Insurance Fund ("Fund") describing his physical status. Tr. 368. Her clinical summary stated a diagnosis of "strain" in the cervical lumbar spine, right shoulder, and right elbow. Tr. 368. A Fund report that September documented that Lugo had "P-strain C-L-S," strain in his right shoulder and right elbow, and herniated nucleus pulposus L4 L5 L5 S1. Tr. 358. The Fund performed physical therapy and established a treatment plan involving Neurontin, Relafen, visiting the pain clinic, getting an MRI, and having a physiatrist re-evaluate his upper back. Tr. 358.

In October 2011, Lugo had an initial appointment with Dr. Julio Mercado ("Dr. Mercado"). Tr. 351. Dr. Mercado's report indicated that Lugo suffered from shoulder pain, leg pain, scoliosis, thyroid, five herniated discs, and a sixth issue that was illegible in his report. Tr. 352. The report stated that Lugo was taking Prozac, Klonopin, and Elavil, and that he "distract[ed]" himself with church, TV, radio, computers, and newspapers. Tr. 352.

In November 2011, the Fund noted that Lugo had "Strain C-L-S, Strain Right shoulder, Strain Right elbow, Herniated Nucleus Pulposus L4 L5 L5 S1" and "Bilateral Carpal Tunnel Syndrome No relation [and] L5, Radiculopathy." Tr. 347. The treatment plan from that report involved Lugo wearing a "hand splint at bedtime" and taking Neurontin and Cataflam. Tr. 347. Lugo continued receiving treatment from for the "organic condition" of "Cervical Strain Lumbar Sacral, Right Shoulder, Right Elbow" in October 2012. Tr. 339. MRI findings reported February 2012 showed Lugo suffered from "Herniated Nucleus Pulposus C3 C4 C6 C7 . . . Bilateral sensory Carpal Tunnel Syndrome No relation . . . L5, Radiculopathy." Tr. 342. The treatment plan in that report entailed Lugo seeing a back specialist, having a psychiatric evaluation, and taking Celebrex and Neurontin. Tr. 342.

Dr. Brenda Concepcion ("Dr. Concepcion") performed a non-examining medical consultation in February 2013, in which she stated, "New evidence submitted showed no worsening of the conditions and no new impairments. There [are] no changes in the functional limitations." Tr. 484. She found Lugo could lift and/or carry 20 pounds occasionally and 10 pounds frequently. Tr. 487. Also, he could stand and/or walk for six hours in an eight-hour workday and sit for the same duration. Tr. 487. Dr. Cindy Ramirez Pagan ("Dr. Ramirez"), a consulting physician, also reviewed Lugo's medical history and found that a person with his limitations "should be able to perform light work." Tr. 466.

### Mental Impairment

The record contains evidence relating to Lugo's mental impairment. A January 2011 report from the Fund, which predates Lugo's alleged onset date of injury (i.e. June 20, 2011), states that the "injured appears depressed and anguished." Tr. 380. He was "logical, cooperative[,] and spontaneous . . . [his] verbal expression [was] normal," he was "oriented in the three spheres," he exhibited good judgment, and he did not have any suicidal thoughts. Tr. 380. The report notes that Lugo said he was "in treatment with private psychiatrist . . . Dr. Rivero;" the Fund's plan included Risperdal, Elavil, Prozac, and referral to a psychiatrist. Tr. 380.

Dr. Jesus Rivero Guevara ("Dr. Rivero"), who was Lugo's treating psychiatrist since 2011, stated that Lugo complained of "severe anxiety and depression" and "various mental illnesses" in his initial interview. Tr. 352, 380, 741. Lugo claimed these impairments, which stemmed from his sister's death in a car accident years ago, were exacerbated by the accident at work that prompted him to apply for disability. Tr. 741. In June 2012, Dr. Rivero found that Lugo's immediate and short-term memory were impaired, while his recent and remote memory "appear[ed] to be intact." Tr. 743. At that time, Lugo had "difficulty completing serial 7s, making mistakes due to difficulty with concentration," and he was "only able to recall 1 in 3 objects at 3 minutes." Tr. 743. Both of these observations indicated "poor attention span." Tr. 743. The report states he was unable to drive to the initial interview because of his "severity of anxiety, lack of concentration, and inattention to road situations." Tr. 743. Lugo was also "very impaired due to poor concentration and impaired short term memory" and suffered from panic attacks. Tr. 744.

Dr. Rivero prescribed Lugo multiple medications to treat his depression, "panic attacks/insomnia," and hallucinations. Tr. 744. He noted that Lugo was consistently anxious and depressed from July 2011 through June 2012, but his depression was no longer present in July or August 2012. Tr. 746–74. Dr. Rivero also noted that Lugo's hallucinations ceased after November 2011. Tr. 746–76. In June 2012, Dr. Rivero prepared a psychiatric medical report. Tr. 741–45. He noted that Lugo was "unable to drive due to [the] severity of [his] anxiety, lack of concentration, and inattention to road situations." Tr. 743. His immediate and short-term memory were "impaired," his mood was "depressed and anxious," he had difficulty with simple math, very poor social skills, a very irritable mood with marked social phobia, very impaired task persistence and attention span, and poor stress tolerance. Tr. 743–44. Dr. Rivero also noted that Lugo had "1-2 panic attacks per week lasting approximately 15-30 minutes," but the report is unclear whether this was the doctor's personal observation or Lugo's account. Tr. 744. In September 2012, Dr. Rivero noted that Lugo exhibited a "decrease in depressed mood, decreased anxiety [and]

decrease[d] insomnia." Tr. 330. During Lugo's 12 recorded visits to Dr. Rivero between August 2011 and August 2012, Dr. Rivero listed his patient's progress as "not improving" on two occasions and "improving" on the other 10 occasions (including Lugo's last three visits in June, July, and August of 2012). Tr. 746–71. In July and August, Lugo was anxious, but not depressed. Tr. 746–49. In October 2012, a Fund report indicated he was no longer seeing Dr. Rivero because Lugo no longer had a "medial" plan. Tr. 334.

In October 2011, the report from Lugo's initial appointment with Dr. Mercado indicated that Lugo had been diagnosed with "major depression" that was recurrent and severe. Tr. 352. He was hospitalized once for approximately two months and received treatment from "PHP (Dr. Jesus)." Tr. 352. At his initial appointment with Dr. Mercado, Lugo's psychomotor was normal and stressed; his mood was anxious, sad, frustrated, and depressed; his attitude was cooperative; and his attention and memory were good. Tr. 353. Dr. Mercado diagnosed Lugo with a global assessment of functioning ("GAF") score of 60. Tr. 353. Lugo had deficiencies in activities of daily living. Tr. 352.

In his assessment dated February 8, 2013, Dr. Hugo Roman Rivera ("Dr. Roman"), consulting psychologist, reviewed "all the evidence in the file." Tr. 484. He stated that Lugo's PS/CE showed diminished memory, while the TP report revealed "affected immediate and short-term memory, but intact recent and remote recalling." Tr. 488. The TP report and PS/CE showed Lugo had diminished concentration, "yet, SIF MER show[ed] adequate attention . . . [and Lugo] is able to carry out simple instructions." Tr. 489. Also, the TP report showed "affected social functioning . . . Yet, at PS/CE [Lugo] was cooperative with no atypical behavior noted." Tr. 489. Finally, Dr. Roman explained: Lugo "is depressed, but is still able to perform a two-step simple command, persist at tasks for two hour intervals, interact with others, and adjust to changes." Tr. 490. Overall, Dr. Roman stated that Lugo lacks the residual functional capacity ("RFC") to perform past relevant work ("PRW"), but that he is not disabled and can perform unskilled work. Tr. 490–91. Dr. Concepcion's CE, dated February 8, 2013, noted that Lugo's statements about the intensity,

persistence, and functionally limiting effects of the symptoms were not substantiated by medical evidence alone. Tr. 486 ("The statements about cognitive deficits are credible, but not to the degree alleged per evidence reviewed.").

Dr. Beatriz Trujillo ("Dr. Trujillo") also performed a consultative examination ('CE") on April 3, 2012, after Lugo was referred by the Disability Determination Program for psychiatric evaluation. Tr. 267. She noted that Lugo was cooperative, appeared to have psychomotor retardation, was anxious and sad, and was logical, coherent, and relevant. Tr. 269. Dr. Trujillo also noted that he had a "poor capacity for tolerance of pressure and stress, his mood is altered with ease, he gets anxious, gets annoyed and gets himself in a bad mood." Tr. 269. She stated that he had a "decreased attention span, gets distracted easily . . . [had] decreased concentration . . . [and] he couldn't complete the subtraction series." Tr. 269. Dr. Trujillo relayed Lugo's claims that he "is always tired, has fatigue and pain, that he can't do household chores . . . [and] that his wife is the one that cleans the house and takes care of him." Tr. 269. She further relayed his claims that he had "decreased social contact" and was "isolated at home, not involved in community activities or parties . . . [and] only spends time with his parents and children." Tr. 269. Dr. Trujillo's diagnosis was of "severe major depression, recurrent." Tr. 270. She gave a "poor prognosis for capacity of labor due to the severity of his mental disorder." Tr. 270. She found he is "competent to manage his goods and money." Tr. 270.

In July 2013, Lugo told Dr. Emelda Ruiz Morell ("Dr. Ruiz") that his pain had not improved, but the doctor observed that "he walks without limitation . . . [and] does not present limitation for seating." Tr. 423. In follow-up notes in August 2013, Dr. Ruiz observed that Lugo was cooperative, not depressed or anxious, and that his sleep had not been altered. Tr. 427. She noted that his progress was "stable," rather than "improving." Tr. 428.

Multiple Fund reports indicated that Lugo's memory and concentration were "adequate." Tr. 323, 334, 353, 402. Dr. Adalisse Borges ("Dr. Borges"), consulting

psychologist, reviewed the record and found that Lugo "can understand, recall, and carry out simple instructions . . . Can adjust to minor routine work demands and . . . complete a normal workday and workweek that does not require dealing with complex and detailed procedures." Tr. 467. Dr. Borges's findings regarding Lugo's attention and concentration were similar to those of Dr. Roman. Tr. 490.

### Hypotheticals to the VE

At the hearing, Lugo testified that he suffers from physical ailments, specifically "lower back pains . . . some bad discs," pain in his neck and shoulders, a thyroid problem, and carpal tunnel syndrome. Tr. 132, 139, 141, 337. He testified that, after his accident, he could not walk for "more than ten minutes," could not stand for more than "15 or 20 continuous minutes," and could only sit for "25-30 minutes." Tr. 135–36. Lugo said that he could lift a gallon of water but could not hold it for long. Tr. 136. He stated that his hands "get swollen," and sometimes he feels "as if [his] bones were hooked," which the Fund diagnosed as carpal tunnel in both hands. Tr. 141–42.

He testified that he pursued multiple avenues of treatment, including going to the Fund starting on the alleged onset date. Tr. 132. The Fund performed "studies" and physical therapy at the Sports Medical Clinic and gave Lugo injections and medications. Tr. 133, 134, 139. He alleged he visited a surgeon who told him, "I will not touch your back." Tr. 134. Lugo said the Fund prescribed pain medication, gave him therapy for his hands on three occasions, and told him to sleep with a wrist brace, but they would not operate on his hands. Tr. 141–42. On a scale from one to 10, Lugo testified that medication lowers his pain from 10 to "between a seven or eight, almost always." Tr. 134. The exception is his thyroid, which is "mostly" controlled by the appropriate medication. Tr. 139.

 Lugo also testified that he suffers from depression. Tr. 138. He testified that his depression does not allow him to "concentrate on anything." Tr. 140. He said he saw Dr. Javier Guevara, who he had previously seen at the Fund, and received multiple medications to treat his depression. Tr. 138–39. Dr. Jesus Rivero hospitalized Lugo at San Juan

Capestrano "in the beginning of [his] condition after the accident" when Lugo informed the doctor that "the idea of taking [his] own life had crossed [his] mind." Tr. 143. After his hospitalization, Lugo testified that his suicidal thoughts "stopped . . . But [he] look[s] for a way not to think about it." Tr. 143. Furthermore, he said that he suffered from panic attacks and nightmares. Tr. 143–44.

After hearing Lugo's testimony, the ALJ posed two hypothetical questions with multiple variations to the VE and then allowed Lugo's attorney to question the VE. Tr. 144–49. Once the VE confirmed that she had heard Lugo's testimony and reviewed the case file, the ALJ asked her to classify Lugo's past jobs. Tr. 144. The VE described Lugo's most recent job as "housing service technician," which is a skilled job, code 168-167-030, with an SVP of seven and light physical effort. Tr. 145. She described his previous job as "shoe machine operator," an unskilled job, code 753-584-010, with an SVP of two and light physical effort. Tr. 145. The ALJ then provided the VE with the following hypothetical:

> Consider a person of 44 years old, with high school education. This person, for the purposes of the first hypothetical question[,] would have a skill for light work, as defined in 20 CFR 404 1657 B, which would require lifting and or carrying 20 lbs. occasionally, ten pounds frequently, sitting down six hours in an eight-hour workday. Standing up or walking about six hours in an eight[-]hour workday. No limitations pushing and or pulling, but an ability for unskilled work that is routine, simple, and repetitive, with frequent but not constant contact with coworkers, and the public, and frequent but not constant handling and fingering.

Tr. 145. The ALJ then asked if this person could do any of Lugo's previous jobs, to which the VE replied that the hypothetical person could not perform the job of a housing inspector because it would require a "much higher mental demand." Tr. 145. But the VE testified that the hypothetical person could do Lugo's prior job of shoe machine operator. Tr. 146.

Alternatively, the ALJ asked if there were any other jobs in the national economy that would suit that hypothetical person in the event that the shoe machine operator job could not be considered. Tr. 146. The VE testified that there are multiple alternative jobs, including laundry folder (code 369.687-018, SVP of two, light physical effort, frequent handling, no contact), checker (code 222.687-010, unskilled, SVP of two, light physical

effort), and mail clerk (code 209.687-026, unskilled, SVP of two, light physical effort). Tr. 146.

The ALJ then changed the hypothetical, asking if instead of "frequent but not constant contact with coworkers and the public," the hypothetical person could only tolerate "occasional" contact with coworkers and the public. Tr. 147. The VE answered that the alternative jobs from the original hypothetical could all still be done by such a person. Tr. 147. The ALJ further altered the hypothetical by asking, "If we lowered it from light work to sedentary work, would there still be jobs, with the limitations that I gave [involving frequent use of hands and occasional contact with coworkers and the public] . . . with the first hypothetical question, or even the second, would there be jobs that this person could do?" To this, the VE testified that such a person could be a weight tester (code 539.485-010, unskilled, SVP of two, sedentary), an envelope addresser (code 209.587-010, SVP of two sedentary), or a surveillance system monitor (code 379.367-010, unskilled, SVP of two, sedentary). Tr. 147–48.

Finally, the ALJ asked: "If we assumed the third hypothetical question, with occasional handling and fingering, could this person do any of the jobs [the VE] previously indicated?" The VE responded that the only job that is sedentary, unskilled, that does not involve public interaction, and that requires occasional handling is that of surveillance system monitor. Tr. 148. Aside from surveillance monitor, "there are no jobs" for a person with those limitations.

Lugo's attorney then questioned the VE, asking, "If the periods of attention and concentration of the individual describe [sic] were lower than two hours due to the pain factor, could he perform these jobs in a sustained way?" Tr. 148. The VE replied, "No, because these unskilled jobs require for the person to say [sic] in good attention and concentration for two hours before a recess." Tr. 148. In her decision, the ALJ relied upon the VE's answers to her hypotheticals. Tr. 119.

### The ALJ's Sequential Evaluation

At Step One of the five-step sequential evaluation process, the ALJ found that Lugo had not engaged in substantial gainful activity since June 20, 2011, the alleged onset date of his disability. Tr. 110. At Step Two, the ALJ found Lugo had multiple severe impairments, including "degenerative disc disease of the lumbo sacral area, cervical, dorsal and lumbosacral spasm and herniations, L5-S1 radiculopathy, carpal tunnel syndrome, and depression." Tr. 110. At Step Three, the ALJ found that Lugo does "not have an impairment of combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 110–111. After considering the entire record, the ALJ found that Lugo is capable of performing light work, as defined by 20 CFR 404.1567(b). Tr. 112. Such light work could include lifting and/or carrying 20 pounds occasionally (and 10 pounds frequently), sitting about six hours in an eight-hour workday, and standing and/or walking about six hours in an eight-hour workday (with no limitations on pushing and/or pulling). Tr. 112. The ALJ found Lugo has a capacity for unskilled work that is routine, simple, and repetitive, with frequent but not constant contact with coworkers and the public, and with frequent but not constant handling and fingering, bilaterally. Tr. 113.

At Step Four, the ALJ found that Lugo is capable of performing past relevant work as a shoe machine operator, as such work "does not require the performance of work-related activities precluded by [his] residual functional capacity." Tr. 118. The ALJ made her assessment at Step Four based on the VE's testimony. Tr. 119. In the alternative, the ALJ also performed an analysis at Step Five and determined that a person of Lugo's age, education, work experience, and residual function capacity could perform a number of other jobs that were not identical to Lugo's past relevant work. Tr. 119. Based on the record as a whole, the ALJ determined that Lugo "has not been under a disability, as defined in the Social Security Act, from the alleged disability onset date of June 20, 2011, through the date of" her decision on March 6, 2014. Tr. 119.

## DISCUSSION

Lugo claims the ALJ erred in two ways regarding her consideration of his mental impairments. First, he claims the ALJ's decision was not supported by substantial evidence because she "ignor[ed] vital medical evidence" and presented the VE with hypotheticals that did not "convey all the plaintiff's limitations." Docket No. 19. Second, Lugo claims the ALJ did not apply the correct legal standards in rendering her decision because she made an alternative finding at Step Five after finding Lugo had not cleared his hurdle at Step Four. *Id.* Lugo does not claim the ALJ erred in considering any of his physical impairments. I examine the ALJ's findings as to these matters in turn.

## I.      Substantial Evidence

Lugo contends the ALJ's decision is not supported by substantial evidence because she presented the VE with hypotheticals that "did not convey all of [Lugo's] limitations." Docket No. 19. He contends that "simple, routine, and repetitive work" is "only a category . . . and it does not cover all the aspects that have to be taken into consideration by the VE when determining what still can be performed in terms of an emotional condition." Docket No. 19 at 18. Lugo argues that by posing questions based only on this "abbreviate[ed]" categorization, the ALJ did not present all the limitations to the VE and, thus, the VE's answers could not constitute "substantial evidence." Docket No. 19 at 18. Specifically, he claims the ALJ's hypothetical "did not account for the effects of [Lugo's] panic attacks . . . nor [his] difficulty to maintain attention and concentration . . . poor control of impulses . . . psychomotor retardation, very poor stress tolerance and anxiety levels . . . [and] memory problems." Docket No. 19. Thus, Lugo argues that the ALJ included limitations in her hypotheticals that "did not clearly relate to the severity of impairment assessed by all the mental examining sources of record," and as a result, "the ALJ's reliance on the jobs the VE identified in response to the hypothetical was not supported by substantial evidence." Docket 19.

An ALJ's hypotheticals to a VE "should convey the claimant's limitations precisely in order to yield relevant responses." *Maldonado* v. *Sec'y of Health & Human Servs.*, 972

F.2d 337 (1st Cir. 1992); *see also Cooper* v. *Bowen*, 880 F.2d 1152, 1158 n.13 (9th Cir. 1989) (VE's testimony cannot "constitute substantial evidence to support an ALJ's determination as to a claimant's disability status unless it accurately reflects all the claimant's limitations"). For "a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." *Arocho* v. *Sec'y of Health & Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982). And to "guarantee that correspondence," the ALJ "must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions." *Id.*

But hypothetical questions need only "reasonably incorporate[] the disabilities *recognized by the ALJ*." *Velez-Pantoja* v. *Astrue* 786 F. Supp. 2d 464, 469 (D.P.R. 2010) (quoting *Bowling* v. *Shalala*, 36 F.3d 431, 435 (5th Cir. 1994)) (internal quotations omitted) (emphasis in original). There is no "hard rule or perfect method of asking hypothetical questions." *Camacho* v. *Astrue*, 978 F. Supp. 2d 116, 122 (D.P.R. 2013). When the claimant's medical record supports certain limitations, an ALJ may imply those limitations within hypotheticals without explicitly stating them to the VE. *See Winschel* v. *Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) ("When medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations.").

Though the ALJ did not use her hypotheticals to list the mental impairments Lugo emphasized in his memorandum of law, her reasoning for excluding them was supported by the medical record as a whole. The ALJ had previously found at Step Three that Lugo did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. 110–111. As the Eleventh Circuit has noted, nothing precludes the ALJ from

considering her findings "at steps two and three" when assessing the claimant's RFC at Step Four. *Winschel* 631 F.3d at 1180 (citing circuit court cases). At Step Four, the ALJ again accounted for the severity of Lugo's mental impairments and stated that they did not "meet or medically equal the criteria of listing 12.04." Docket No. 19, Tr. 111. She explained that to meet the threshold of 12.04, which covers depressive disorders, a claimant must satisfy the criteria for either "paragraph B" or "paragraph C." Tr. 111–12. To satisfy "paragraph B," Lugo's depression had to result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Tr. 111. *See also* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04. The claimant's level of restriction is based on a five-point scale: None, mild, moderate, marked, and extreme. 20 C.F.R. § 416.920a(c).

Using these criteria, the ALJ found that "the severity of the claimant's mental impairment does not meet or medically equal the criteria of listing 12.04," because none of Lugo's restrictions rated higher than "moderate" on the five-point scale. Tr. 111. Specifically, regarding activities of daily living, the ALJ found that Lugo has a "mild restriction." Tr. 111. She referenced Lugo's testimony that he accompanies his father to go bet on horses, watches TV, and sometimes accompanies his wife to the supermarket as evidence of the mild restriction classification. Tr. 111, 130, 137. The ALJ also cited the Fund report from October 2011 that indicated Lugo went to church and engaged with TV, radio, computers, and newspapers. Tr. 352. Such evidence supports the ALJ's conclusion that Lugo's impairments had a mild restriction on his daily living activities and thus do not satisfy the "paragraph B" criteria.

Regarding social functioning, the ALJ found that Lugo has "moderate difficulties." Tr. 111. Dr. Rivero, Lugo's treating psychiatrist, reported in June 2012 that Lugo exhibited "very poor social skills" and had a "very irritable mood with marked social phobia." Tr. 744. But the record shows that in the same report he also described Lugo's "mental status"

as "unremarkable" during their interaction. Tr. 743. The ALJ implicitly resolved the internal tension within this report by citing another Dr. Rivero report where he describes Lugo as "appropriate," along with a number of other "treating sources" that "consistently described the claimant as cooperative." Tr. 111, 774, 806 (*see* 335), 809 (*see* 339), 822 (*see* 353), 869 (*see* 415), 878 (*see* 427). Furthermore, the ALJ noted Lugo's reports to the Fund that he socializes with people. Tr. 821 (*see* 352). Taken together, the ALJ's citations to the record support her finding that Lugo suffered from moderate difficulties in social functioning, and that those difficulties are not severe enough to qualify as "marked" difficulties. Thus, Lugo's difficulties in social functioning do not satisfy the "paragraph B" criteria.

Regarding "concentration, persistence, or pace," the ALJ found that Lugo has "moderate" difficulties. Tr. 111. The ALJ acknowledged that Dr. Rivero found Lugo had impaired short-term and immediate memory, and Dr. Trujillo found that his attention and concentration were diminished. Tr. 112, 269, 743. But she contrasted these findings by citing a report by Dr. Mercado and stating that the Fund "consistently reported" Lugo had good attention and memory. Tr. 822 (*see* 353). Though she only cited the one report from Dr. Mercado for this claim, there are three additional Fund reports in the record that list his memory and concentration as "adequate." Tr. 323, 334, 402. The ALJ offers evidence to show Lugo was oriented in the three spheres, had a "logical and relevant thought process," and had adequate judgment. Tr. 111–12. Though Lugo's ability to work may not be "unaffected" by the limitations stemming from his mental impairment, they do not preclude the ALJ from making a broader assessment about Lugo's abilities when posing hypotheticals. Tr. 148–49; *see Winschel*, 631 F.3d at 1181 ("When medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work *despite* limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations.")

Lugo-Crespo v. Commissioner of Social Security, Civil No. 16-1242 (BJM)                17

(emphasis added). Thus, a finding that Lugo has moderate difficulties in concentration, persistence, or pace does not satisfy the "paragraph B" requirement.

Regarding the final "paragraph B" category, episodes of decompensation, the ALJ found that Lugo has experienced "no episodes of decompensation, which have been of extended duration." Tr. 112. She notes that Lugo was hospitalized at San Juan Capestrano in 2011, but that his diagnosis was for "depression, single episode, and a generalized anxiety disorder." Tr. 112, 256. Aside from that incident, the record does not show that Lugo has suffered from any episodes of decompensation that would satisfy the "paragraph B" criteria. In sum, Lugo fails to satisfy the "paragraph B" criteria of 12.04 because he did not exhibit marked difficulties in at least two of its categories.

The ALJ also performed an analysis of Lugo's case under the "paragraph C" criteria, an alternative avenue for satisfying 12.04, and found that the evidence does not meet the "paragraph C" criteria. Tr. 112. To meet the "paragraph C" criteria, the record must show "at least two years of a chronic affective disorder that has caused 'more than a minimal limitation of the ability to do any basic work activity, with symptoms or signs currently attenuated by medication of psychosocial support'" and "one of several symptoms listed in the code." *Bowers* v. *Colvin*, 2014 U.S. Dist. LEXIS 95306, *41 (D. Mass 2014) (quoting 20 C.F.R. § 404, subpt. P, app. 1 at § 12.04C). Here, the ALJ found, and the record confirmed, that Lugo's "major depression does not satisfy the [paragraph] 'C' criteria or section 12.04 of the Listing of Impairments." Tr. 112. After establishing that Lugo's mental impairment did not meet or medically equal the criteria of listing 12.04, the ALJ proceeded to the "more detailed" mental residual functional capacity assessment at Steps Four and Five. Tr. 112.

At Step Four, the ALJ must make a finding about the claimant's RFC based on all the relevant medical and other evidence in the case record. 20 C.F.R. §§ 404.1520(e), 416.920(e). In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain specific findings of fact as to: (1) the individual's

physical and mental RFC, (2) the physical and mental demands of the past job/occupation, and (3) whether the individual's RFC would permit a return to his or her past job or occupation. SSR 82-62, 1982 SSR LEXIS 27 at *10. In the second finding required by SSR 82-62, the claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands, and non-exertional demands of such work. *Id.* at *6–7. The claimant has the initial burden of showing that he can no longer perform past work because of his impairment by laying the foundation as to what activities his former work entailed, and pointing out how his functional incapacity renders him unable to perform it. *Id.* at *5–6. *See Manso-Pizarro*, 76 F.3d at 17. Once this threshold is crossed, the ALJ must then compare the RFC assessment with the physical and mental demands of past relevant work and determine if the claimant can still do that kind of work. 20 C.F.R. §§ 404.1560(b). If the claimant retains the RFC to perform the actual functional demands and job duties of a particular past relevant job, the claimant will be found not disabled in the third finding. 20 C.F.R. §§ 404.1520(f), 416.920(f). *See Santiago*, 944 F.2d at 5 (citing SSR 82-61).

When making her decision about the extent of Lugo's residual functional capacity, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." Tr. 113. When considering a claimant's symptoms, an ALJ follows "a two-step process." Tr. 113. First, she must "consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the [claimant's] pain or other symptoms." *Gerry* v. *Barnhart*, 2004 U.S. Dist. LEXIS 22793, *14 (D.N.H. 2004). If the medically determinable physical or mental impairment(s) does not exist, or if they do but "could not reasonably be expected to produce the individual's pain or other symptoms," then "the symptoms cannot be found to affect the individual's ability to do basic work activities." *Id.* Second, once the underlying physical or mental impairment(s)

that "could reasonably be expected to produce the [claimant's] pain or other symptoms has been shown," the ALJ "must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the [claimant's] ability to do basic work activities." *Id.* For the second step, the ALJ must "make a finding on the credibility of the [claimant's] statements based on a consideration of the entire case record." *Id.* at *15.

After considering all the evidence, the ALJ found Lugo's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but his statements concerning the intensity, persistence, and limiting effects of those symptoms are only "partially credible." Tr. 113. The ALJ noted Lugo's self-reported pain rating at the hearing (a "7 or an 8" on a 10-point scale) was at odds with the rating of "4," which corresponds with "mild to moderate pain," that he reported at his most recent physical therapy session before the hearing. Tr. 114, 134, 871 (*see* 419). Also, Lugo's claims regarding the severity of both his physical pain and mental impairments are inconsistent with, and not supported by, the evidence of his daily activities. Tr. 114. The ALJ found his claims of mental impairment were "inconsistent with the findings of his treating sources," except those of Dr. Rivero. But the ALJ also found that Dr. Rivero "issued a report with limitations that are not entirely consistent with his treatment notes." Tr. 114. Dr. Rivero's treatment notes on record indicate that Lugo's mental health improved consistently over a year of visits. During Lugo's 12 recorded visits with Dr. Rivero between August 2011 and August 2012, Dr. Rivero listed his patient's progress as "improving" on 10 of 12 occasions (including Lugo's last three visits in June, July, and August of 2012). Tr. 746–71. In July and August, Lugo was anxious, but not depressed. Tr. 746–49. In October 2012, a Fund report indicated Lugo had ceased seeing Dr. Rivero. Tr. 334.

The ALJ found Dr. Rivero's findings conflicted both with his own assessments and with those of other doctors on the record; but it is the ALJ's duty to weigh all the evidence, assess what is credible, and then present only that credible evidence in hypotheticals to the

VE. *See Velez-Pantoja* v. *Astrue*, 786 F. Supp. 2d 464, 469 (D.P.R. 2010) ("It is well within the ALJ's authority to weigh the evidence, to determine the credibility of the plaintiff's subjective complaints, and to use only credible evidence in posing a hypothetical question to a vocational expert."). When there is conflicting evidence that could justify a different conclusion, the court must affirm the Secretary's resolution "so long as it is supported by substantial evidence." *Rodriguez Pagan* v. *Sec'y of Health & Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987). Thus, the ALJ's credibility determination about Lugo's statements concerning the severity of his impairments must be given deference because it is supported by the record.

The ALJ cited evidence in Fund mental health reports from January 2011 through March 2013 to show Lugo made improvements that culminated in a rating of "5% of disability in connection to his mental condition" at the time of his discharge in March 2013. Tr. 115–16, 324. Multiple Fund reports in the record indicate that Lugo's memory and concentration were "adequate." Tr. 323, 334, 353, 402. Dr. Borges reviewed the objective evidence on record and found that Lugo "can understand, recall, and carry out simple instructions . . . Can adjust to minor routine work demands and . . . complete a normal workday and workweek that does not require dealing with complex and detailed procedures." Tr. 467. Dr. Borges's assessments of Lugo's attention and concentration were similar to Dr. Roman's. Tr. 490. In July 2013, the record shows that Dr. Ruiz observed Lugo walking "without limitation" and not exhibiting any limitations for seating. Tr. 423. In follow-up notes in August 2013, Dr. Ruiz observed that Lugo was cooperative, not depressed or anxious, and that his sleep had not been altered. Tr. 427. The record also contains observations from Dr. Roman explaining that Lugo "is depressed, but is still able to perform a two-step simple command, persist at tasks for two hour intervals, interact with others, and adjust to changes." Tr. 490.

The ALJ assessed the opinions of the treating and consulting doctors and gave "great weight" to their findings that are supported by the objective medical evidence in the

record. Tr. 112–18. After weighing the conflicting opinions, the ALJ determined that there is substantial evidence to show Lugo has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). Tr. 117. From this determination, she concluded that Lugo is capable of performing past relevant work as a shoe machine operator, as that work "does not require the performance of work-related activities precluded by [Lugo's] residual functional capacity (20 CFR 404.1565)." Tr. 118. Alternatively, the VE found that a person with Lugo's RFC, age, education, and work experience could also perform other jobs in the national economy. Thus, the ALJ correctly determined that Lugo "has not been under a disability, as defined in the Social Security Act, from June 20, 2011, through the date of" her decision in March 2014. Tr. 119.

In sum, the ALJ assessed the credibility of Lugo's mental impairments based on all the evidence and found that the record did not support the level of severity Lugo was alleging. Accordingly, the ALJ did not have to incorporate the non-credible evidence in her hypotheticals to the VE. I find that the questions the ALJ posed to the VE, which incorporated that RFC determination, accurately reflected Lugo's impairments and their severity. Tr. 144–48. Therefore, the VE's testimony supports the ALJ's conclusions at Steps Four and Five that Lugo is not disabled.

## II.    Correct Legal Procedure

The ALJ found at Step Four that Lugo was capable of returning to his past relevant work as a shoe machine operator. Tr. 118. The ALJ also found, in an alternative analysis at Step Five, that Lugo could perform other jobs were he not to perform his past relevant work. Tr. 119. Lugo argues that the ALJ failed to apply the correct legal standard when she made determinations at both Steps Four and Five in the same hearing decision. Docket No. 19 at 13. Lugo claims that the sequential process "does not provide[] for a determination at two steps at the same time." Docket No. 19 at 13.

Lugo is mistaken. In the context of social security disability cases, it is not a novel concept for an ALJ to make both a finding at Step Four and an alternative finding at Step

Five in his or her hearing decision. *See Jimenez* v. *Colvin*, 2016 U.S. Dist. LEXIS 135686, *47 (S.D.N.Y. 2016); *Pearce* v. *Astrue*, 2009 U.S. Dist. LEXIS 102498, *2 (W.D. Wash. 2009); *Alcott* v. *Colvin*, 2014 U.S. Dist. LEXIS 130176, *21 (W.D. Mo. 2014); *Wolfe* v. *Comm'r of Soc. Sec.*, 2012 U.S. Dist. LEXIS 112668, *7 (M.D. Fla. 2012). Thus, Lugo's contention that the ALJ erred by making determinations at both Step Four and Step Five is without merit.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 28th day of July 2017.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge